UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

DIGITAL ASSURANCE CERTIFICATION, LLC,

    Plaintiff,

v.                                    Case No: 6:17-cv-72-Orl-41TBS

ALEX PENDOLINO, JR. and LUMESIS, INC.,

    Defendants.

## ORDER

On September 6, 2018, the Court heard argument on the following motions:

- Lumesis, Inc.'s Motion to Compel Responses to Interrogatories and Production of Documents and for Protective Order (Doc. 113);

- Pendolino's Motion to Compel and for Protective Order and Stay of Discovery (Doc. 114);

- Plaintiff's Motion to Compel Discovery from Lumesis, Inc. (Doc. 122); and

- Defendant Lumesis, Inc.'s Motion for Protective Order Staying Further Discovery of it and Certain Third Parties by Plaintiff Digital Assurance Certification, LLC (Doc. 132).

Plaintiff and Defendant Lumesis, Inc. provide competing services to participants in the municipal bond market. Plaintiff alleges that its former employee, Defendant Alex Pendolino, Jr., misappropriated its trade secrets and disclosed them to his current employer, Lumesis. Plaintiff also alleges that Lumesis, with the assistance of non-party Stifel, Nicolaus & Company, Inc., used Stifel's password to access Plaintiff's nonpublic internet website and misappropriate trade secrets.

Defendants complain that Plaintiff has not identified the trade secrets they

allegedly stole with sufficient particularity. On this basis, Defendants have refused to participate in further discovery and seek a stay and protective order precluding Plaintiff from taking further discovery until it identifies the trade secrets it accuses Defendants of stealing. Plaintiff maintains that it has more than adequately identified its trade secrets and if Defendants want additional detail, they can learn that information through depositions. Plaintiff contends that it would be unprecedented to permit Lumesis and Pendolino to take discovery while staying any discovery by it, and Plaintiff alleges that it will be prejudiced if already scheduled nonparty depositions, needed for trial, are stayed.

"A defendant is entitled to know the bases for plaintiff's charges against it. The burden is upon the plaintiff to specify those charges, not upon the defendant to guess what they are…. Clearly until this is done, neither the court nor the parties can know, with any degree of certainty, whether discovery is relevant or not…. Xerox Corp v. IBM Corp., 64 F.R.D. 367, 371 (S.D.N.Y. 1974). "It is axiomatic that a party may not assert a cause of action for misappropriation of trade secrets without identifying for the opposing party the trade secrets at issue." Knights Armament Co. v. Optical Sys. Tech., Inc., 254 F.R.D. 463, 467 (M.D. Fla. Nov. 20, 2008). "Florida courts recognize that '[i]n order to ascertain whether trade secrets exist, the information at issue must be disclosed'"…. "Because Del Monte is asking this court to find that trade secrets exist and were misappropriated by Dr. Funk, Del Monte must reveal the information it ultimately seeks to protect." Del Monte Fresh Produce Co. v. Dole Food Co., Inc., 148 F.Supp.2d 1322, 1324-225 (S.D. Fla. 2001) (quoting Lovell Farms, Inc. v. Levy, 641 So.2d 103, 105 (Fla. 3d DCA 1994) (in turn quoting Becker Metals Corp. v. West Florida Scrap Metals, 407 So.2d 380, 382 (Fla. 1st DCA 1981)); AAR Mfg., Inc. v. Matrix Composites, Inc., 98 So.3d 186, (Fla. 5th DCA 2012 ("In trade secret misappropriation cases, a Plaintiff is required to identify with reasonable

particularity the trade secrets at issue before proceeding with discovery.")).

The alleged trade secrets at issue in this case include Plaintiff's methodologies and processes for performing its broker-dealer services. When asked to identify those methodologies and processes Plaintiff responded:

> Without repeating or limiting the information contained in the Second Amended Complaint in its entirety, PLAINTIFF has explained therein at paragraphs 16-19, 25-26, 32-33, 35-38, 40, 42, 47-49, 61, 87, 92, 94 and 107, among other paragraphs, the many years of research and analysis that went into DAC's development of its proprietary methodologies and processes that have placed DAC at the forefront of the municipal bond compliance market with its uniquely accurate and comprehensive analysis and reports for its clients. DAC also explains therein that Pendolino was meticulously trained on how to utilize DAC's trade secrets to conduct DAC's confidential services for its clients. This training included, but was not limited to, teaching Pendolino: how to efficiently access and research the data sources, including the EMMA system, Bloomberg system and other information vendors; how to identify the important and relevant data out of huge volumes of information available; how to analyze, compile and consolidate that data; how to identify problems and describe problems; how to customize findings and notes based upon each client's particular needs and preferences; and how to enter the information into the DAC system to create a complete summary report. Pendolino also sought out, in the Summer of 2016, one-on-one training from DAC's Chief Technology Officer, Geeta Pandit to learn the details of the programming behind the DAC System. Also as explained in the Second Amended Complaint (specifically at paragraphs 50-56 and other paragraphs), Pendolino was provided with DAC's trade secrets only because he had signed a Confidentiality Agreement therein agreeing that he would not disclose the information to any third party and would not use any of the trade secret and proprietary information for any purpose other than to provide services to DAC.
>
> Pendolino is now working for Lumesis and performing the same services for Stifel and U.S. Bank as a Lumesis employee that he provided for these two companies while they were clients of DAC. As such, Pendolino's knowledge of DAC's Trade Secrets is being utilized on a daily basis to Lumesis's advantage.

(Doc. 118, at 9). In a supplemental response to the same interrogatory Plaintiff said:

> DAC's methodology was developed in strict compliance with the SSAE (Statements on Standards for Attestation), and was designed to comply with reporting obligations imposed by federal securities laws, including, specifically, satisfaction of the Municipalities Continuing Disclosure Cooperation ("MCDC") Initiative and confidential aspects thereof. DAC's methodology was provided to each DAC client, including Stifel, in the confidential and proprietary contract for services with each client, including specifically at Exhibit A to each contract. That methodology, which captures a substantial segment of DAC's trade secrets, has already been produced to both Pendolino and Lumesis at DAC000206- DAC000210, in this litigation, and was again produced in Response to Lumesis's Request for Production Nos. 11 and 15, located at DAC028155-DAC028180 (designated as "Highly Confidential" pursuant to the Stipulated Confidentiality Agreement). DAC's confidential and trade secret pricing structures are also included in its contracts with its clients, and, with respect to the Stifel and US Bank, such information has been produced. However, as stated in DAC's Answers to Lumesis's First Set of Interrogatories, the magnitude of DAC's trade secrets is not, and cannot be, completely captured in pieces of paper. The process of developing the correct methodology, and then training employees how to implement the methodology and locate, analyze, and summarize the key information into work papers which could then be input into the DAC System for generating the DAC Summary Findings Page for a particular obligated party, are all DAC trade secrets. Further, DAC's development of a training process, and then training Broker-Dealers and their bankers how to use and understand the DAC Summary Findings Page, are also DAC trade secrets. Thus, while the DAC Summary Findings Page is a protected DAC trade secret, it is merely the end-product, and every step in the process to creating a particular Summary Findings Page is each a DAC trade secret. As stated in DAC's Supplementation to Lumesis's First RFP, (served by DAC on May 31, 2018) and DAC's letter correspondence accompanying its document production on May 31, 2018, DAC has produced numerous documents containing DAC trade secrets, all of which are identified with the designation of "Highly Confidential" in the document productions made on April 30, 2018, May 15, 2018, and May 31, 2018. While DAC's interrogatory answers and the documents produced in response to Lumesis's Request for Production together describe the DAC trade secrets, further explanation regarding

- 4 -

the DAC trade secrets is best obtained through deposition questioning of DAC's corporate representatives.

As stated in DAC's previous interrogatory answers, Stifel produced over 20,000 pages of documents in response to DAC's subpoena (bates: STIFEL 000001 - 0022817), all of which are communications with Lumesis starting from approximately March 2016 to June 2017. The portions of the production that DAC has been allowed to review contain examples of Stifel and Lumesis collaborating on <u>how to change</u> Lumesis's processes, and <u>how to revise</u> Lumesis's reports and final summary product such that they would more closely mimic the DAC processes and final report, which – as Stifel's lead contact with Lumesis explained – was what their bankers "are used to" (Stifel 000038). By way of example only, on May 18, 2016, Stifel's Mary McPike provided Lumesis with an attachment of the Lumesis "CD Look Back - Dashboard" and explained "The attached dashboard print-out is a (very scary but real) example of why a consolidated report is absolutely vital." (Stifel 000073-000076). This is just one specific example of Stifel advising Lumesis that Lumesis needed to change their process to better align with DAC's process, because DAC already provided Stifel (and other clients) with a consolidated look back report (*see* DAC Answers to Interrogatory Nos. 5-7, 9), and, as Ms. McPike stated in March, the goal was to provide Stifel's bankers with what they were used to. Although DAC is not yet authorized to review various attachments to the emails due to such attachments being marked "Highly Confidential", the emails (particularly but not limited to: Stifel 00001-2, 000021-22, 000038-42, 000061, 000069-78, 000128-160, 000173-248) demonstrate that the Lumesis procedures and work papers were evolving throughout 2016 with the instruction and assistance of Stifel, and DAC is informed by its counsel that the changes requested in the emails (mainly from Mary McPike) are thereafter reflected in the attachments. Indeed, DAC has observed changes in the Lumesis reports from presentations made by Lumesis at various seminars and via email promotions, as well as from submissions by DAC clients who have requested DAC's comment on such papers. By way of example, *see, e.g.,* DAC025546-025564, DAC025572-025755, DAC026097- 026301, DAC026809-026816, DAC026834-026836, DAC026878-026881, DAC026883-026908, DAC027748-027780, DAC027814-027839, DAC027841- 028023, DAC028113-028117, DAC028121, DAC028126-028129, Stifel 000073-000078). Furthermore, the Stifel production reflects only the documents maintained and

> produced by Stifel, and DAC is awaiting Lumesis's production of its own communications, both internal and with Stifel, many of which should overlap with the Stifel production, and which will be responsive to DAC's First Request for Production Nos. 1, 4, 10, 11, and 12.
>
> Once Lumesis and Stifel managed to create a final report product Stifel was comfortable with, the final piece to the puzzle was to have someone trained by DAC to efficiently pull the key information to then populate the report, namely, Pendolino. The second Stifel production (Stifel 000465-022817) shows that Pendolino immediately began performing that function for Lumesis upon commencing employment there. As both Pendolino and Stifel were bound by written agreements to keep DAC's trade secret information and processes a secret, the documents referenced by DAC support DAC's allegations of misappropriation.

(Id., at 10-11). This description, along with Plaintiff's descriptions of its other trade secrets (with the exception of Plaintiff's Summary Findings Page), are insufficient to inform Defendants of the claims being made against them. This conclusion was borne out at the hearing when Plaintiff's lawyers could not explain one of their client's alleged trade secrets, and Plaintiff's corporate representative was called on to provide the explanation.

At the hearing, the Court questioned counsel in an effort to understand what trade secrets are at issue and create a workable list so that the parties can conduct efficient, effective discovery. The following list, hereinafter the "Trade Secrets," is the product of that effort. All of these Trade Secrets are limited to Plaintiff's broker-dealer business. The Trade Secrets are:

(1) The prices Plaintiff charges its customers;

(2) The variations in Plaintiff's pricing for different reviews;

(3) How to access the Plaintiff non-public platform;

(4) All information accessible by accessing the Plaintiff's non-public platform using the Stifel password;

(5) The Plaintiff's Summary Findings Page;

(6) The Plaintiff's Consolidation Requirements Reports;

(7) Contracts between Plaintiff and the following:

    (a) Jeffries LLC;

    (b) Piper Jaffray;

    (c) US Bank Municipal Securities Group;

    (d) Loop Capital Markets LLC;

    (e) Stifel, Nicolaus & Company, Inc.;

    (f) Citigroup Global Markets, Inc.;

    (g) RBC Capital Markets, LLC;

(8) How the Plaintiff's platform works;

(9) The training Plaintiff's employees receive;

(10) Determination of the obligated parties on bond issues; and

(11) How Plaintiff determines the ratings on obligated parties.

Regarding category 3, Plaintiff alleges that Stifel, wrongly used and/or permitted the use of its password to facilitate Lumesis' access to Plaintiff's non-public platform. Information concerning the disclosure and use of the Stifel password to benefit Lumesis, and any other information disclosed to Lumesis that would have facilitated access to the non-public areas of the Plaintiff's platform by Stifel, Lumesis or Pendolino is therefore, discoverable.

For purposes of category 4, if someone with the Stifel password could go to the Plaintiff's platform and view non-public information, then that non-public information was accessible for purposes of this category.

Plaintiff alleges that its Trade Secrets were also taken by other means, including by Pendolino downloading them onto a USB drive, and by removing printed copies of Plaintiff's documents from its offices. For each document containing Plaintiff's trade secrets that was allegedly stolen by or on behalf of a Defendant, a copy must be produced to Defendants before the document, and the information it contains, will be considered a Trade Secret upon which Plaintiff's claims are based.

The Court understands that not all of Plaintiff's Trade Secrets, including for example, employee training, have been reduced to writing. Still, if Plaintiff is claiming the information is a Trade Secret that was misappropriated by a Defendant, then it must furnish a written description to Defendants. Otherwise, Defendants will not have fair notice of what they are accused of stealing and may be unfairly surprised at trial. Here, a degree of specificity is required. For example, it is not sufficient to say that Pendolino was trained to identify the obligated parties on bond deals. What must be disclosed is what Pendolino was actually taught to do, such as which documents and which clauses in those documents he was taught to read, and/or who he was taught to ask for the information.

Ideally, the parties will, through the meet-and-confer process, expand, reduce, and otherwise refine the list of Trade Secrets. If they are unable to agree, those matters can be submitted to the Court for resolution. Now that some Trade Secrets have been identified and a process for identifying additional Trade Secrets has been established, Defendants' motions for a stay and protective order can be and are **DENIED**.

Plaintiff wants to know how much it cost to develop Lumesis' DIVER platform because that may constitute evidence of wrongdoing if, for example, the amount is unreasonably low. Plaintiff also wants to know this information, along with Lumesis' gross

and net revenues from the DIVER platform, because it may be material to the calculation of Plaintiff's damages. This information is relevant and discoverable.

Plaintiff suspects that after Defendants stole its Trade Secrets, they approached Stifel, U.S. Bank, and RBC Bank, offering to provide the same broker-dealer services those entities were buying from Plaintiff, for less money. For this reason, Plaintiff seeks to discover the communications between Lumesis and Stifel, U.S. Bank, and RBC Bank. To the extent those communications concern the provision of broker-dealer services by Plaintiff and Lumesis to Stifel, U.S. Bank and RBC Bank, they are relevant and discoverable.

Now, Lumesis shall produce the following information to Plaintiff:

(1) Counsel for Lumesis stated his understanding that the costs and revenues associated with the DIVER platform can be isolated and broken out in Lumesis' financial documents. If this is correct, then for each of the last 4 years, Lumesis shall produce those portions of the following documents which concern the costs to develop and improve the DIVER platform, and the gross and net revenues from the DIVER platform:

(a) Audited financial statements including income statements, balance sheets, and cash flow statements;

(b) Unaudited financial statements including income statements, balance sheets, and cash flow statements;

(c) Unaudited quarterly financial statements including income statements, balance sheets and cash flow statements;

(d) Lumesis' general ledger;

(e) All other documentation regarding Lumesis's costs to develop and expand its DIVER platform including details of all attorney fees paid;

(f) All of Lumesis financial information provided to third-party lenders for the purpose of securing a loan or line-of-credit.

If this information cannot be broken out, then the complete documents shall be produced to Plaintiff.

(2) All documents and communications between Lumesis and Safeguard Scientifics, Inc. ("SFE") relating to the development, expansion, or funding of the DIVER product.

(3) All documents relating to the Series A financing provided by SFE to Lumesis in February 2012 for DIVER-related product development including status or progress reports on the development of the DIVER product.

(4) All documents relating to the $6.2 million in SFE aggregate funding to Lumesis to the extent such funding was for DIVER related product development including status or progress reports regarding the development of the DIVER product.

(5) Copies of all Lumesis financial information provided to SFE for the purpose of financing development or expansion of DIVER related product development.

(6) For the last 4 years, all financial information relating to Lumesis relationship with Stifel, restricted to broker-dealer services, including:

    (a) All bids or proposals for service;

    (b) All proposals and negotiations concerning pricing;

    (c) All revenue data including the number of bonds serviced and price of service;

    (e) All invoices or receipts;

    (f) All gross income and/or gross profit data;

    (g) All cost-of-good sold data including over-head expense; and

(h) All net income data.

(7) For the last 4 years, all financial information relating to Lumesis' relationship with U.S. Bank, restricted to broker-dealer services, including:

(a) All bids or proposals for service;

(b) All proposals and negotiations concerning pricing;

(c) All revenue data including the number of bonds serviced and price of service;

(e) All invoices or receipts;

(f) All gross income and/or gross profit data;

(g) All cost-of-good sold data including over-head expense;

(h) All net income data; and

(i) all net income data;

(8) For the last 4 years, all documents and communications to, from or with U.S. Bank addressing the terms of the relationship between Lumesis and U.S. Bank, including contracts and draft contracts regarding or relating to broker-dealer services to be performed by Lumesis;

(9) For the last 4 years, all documents and communications to, from or with U.S. Bank regarding or relating to broker-dealer product and services Lumesis could and would provide to U.S. Bank as well as U.S. Bank's requests, guidance and information regarding features and information U.S. Bank wanted in the broker-dealer services and finished product received from Lumesis. This includes communications and documents exchanged with U.S. Bank regarding:

(a) formatting and display of information, reports, or summaries to be provided by Lumesis;

(b) links to be included in information, reports or summaries to be provided by Lumesis;

(c) types and categories of data and information to be included within the reports, summaries or information provided by Lumesis;

(d) types and categories of data and information to be excluded from the reports, summaries or information provided by Lumesis; and

(e) data processing logic to be employed to determine or effect any of (a) - (d), including but not limited to: computer code, flowcharts and other written descriptions.

(10) For the last 4 years, all documents and communications to, from or with RBC Bank addressing any proposals by Lumesis to perform broker-dealer services for RBC Bank and any contracts, draft contracts, pricing negotiations or any other communications or Documents regarding or relating to such services to be performed by Lumesis;

(11) For the last 4 years, all communications between Pendolino and Stifel reference Plaintiff, Plaintiff's documents, Plaintiff's processes, or employees.

(12) For the last 4 years, all documents concerning, referencing or regarding efforts by Defendants to discuss or develop broker-dealer processes or procedures similar to those broker-dealer processes and procedures utilized by Plaintiff to perform broker-dealer services.

(13) All documents concerning, referencing or regarding efforts by Defendants to develop documents and reports which are similar to Plaintiff's documents.

Plaintiff has 14 days from the rendition of this Order to produce to Defendants copies of the documents containing the information Plaintiff contends are its Trade Secrets. Lumesis has 14 days from the rendition of this Order to produce to Plaintiff the

13 categories of information described above. Each party has a duty to supplement its productions if, and when necessary.

The Court is unaware of any reason why relevant information should be redacted from these productions. If this continues to be an issue, appropriate motions should be filed.

Except to the extent provided above, all of the pending motions are **DENIED without prejudice**.

**DONE** and **ORDERED** in Orlando, Florida on September 9, 2018.

THOMAS B. SMITH
United States Magistrate Judge

Copies furnished to Counsel of Record